REDEVELOPMENT COMMISSION OF HIGH POINT v. DENNY ROLL AND PANEL COMPANY; EDWARD N. POST; SUBSTITUTED TRUSTEE; HIGH POINT BANK AND TRUST COMPANY; GUILFORD COUNTY AND CITY OF HIGH POINT.

(Filed 27 March 1968.)

**1. Eminent Domain § 11—**

In condemnation proceedings the issue as to the amount of damages or compensation is for determination *de novo* by jury trial in the Superior Court. G.S. 40-19, G.S. 40-20.

**2. Eminent Domain § 6—**

Whether property involved in a voluntary sale is sufficiently similar in nature, location and condition to the property appropriated by condemnation to admit evidence of its sale and the price paid therefor as a guide to the value of the condemned property is a question to be determined by the trial judge in the exercise of his sound discretion.

**3. Same—**

Evidence tending to show a decrease in the market value of one piece of property some three and one-half blocks from the property sought to be condemned *is held* properly excluded by the trial court in the exercise of its discretion.

**4. Same—**

The exclusion of testimony relating to the value of property sought to be condemned by a municipal redevelopment commission *is held* without error where testimony of similar import was admitted without objection.

HUSKINS, J., took no part in the consideration or decision of this case.

APPEAL by petitioner from *Crissman, J.,* March 20, 1967 Civil Session of GUILFORD, High Point Division, docketed and argued as No. 691 at Fall Term 1967.

Petitioner, Redevelopment Commission of High Point (Commission), pursuant to authority conferred by the "Urban Redevelopment Law," G.S. Chapter 160, Article 37, instituted this special proceeding, as authorized by G.S. 160-465, in accordance with the procedure prescribed by G.S. Chapter 40, Article 2, to acquire by condemnation the fee simple title to described property known as 215 South Centennial Avenue, High Point, North Carolina, owned by defendant Denny Roll and Panel Company (Panel Company). Edward N. Post, substituted trustee, and High Point Bank and Trust Company, were joined as respondents on account of their respective interests under a deed of trust on said property. The City of High Point and Guilford County were joined as respondents on account of their claims for *ad valorem* taxes. Hereafter the word "respondent" will refer only to respondent Panel Company.

It was stipulated November 8, 1965, the date the petition was filed, was "the date of taking"; and that the only issue for determination was the issue of damages. The assistant clerk of superior court, by order consented to by counsel for petitioner and for respondent, appointed Commissioners. They assessed respondent's damages at $195,000.00. The assistant clerk affirmed their report and entered judgment in accordance therewith. Both petitioner and respondent excepted and appealed to the superior court for trial by jury of the issue of damages.

Upon trial in the superior court, evidence was offered by respondent and by petitioner.

The subject property is located in the City of High Point, approximately two blocks from the courthouse. It fronts 294.4 feet on South Centennial Avenue and extends east, at varying widths, to Mangum Street, the frontage on Mangum being 390 feet. It is approximately in the center of the block bounded on the north by East Commerce Street and on the south by East Green Street.

On November 8, 1965, the subject property, then the site of respondent's operations as a plywood manufacturing plant, consisted of a land area of 98,394 square feet and of a complex of buildings. The oldest buildings were erected in 1902 and others were added from time to time through the years. The buildings, including balconies and basements, had a total floor space of 65,691 square feet.

There was evidence describing the subject property in detail. Each of the thirteen buildings and additions thereto, including its age, composition, location, function, etc., was described. Fixtures, including the heating, sprinkler and wiring systems, were described. Outside facilities, including retaining walls, fencing, paved driveways and parking lots, railroad spur track, etc., were described. In

addition to this descriptive testimony, the jurors, under the court's order and supervision, saw for themselves the land, buildings and facilities constituting the subject property.

There was conflicting evidence as to the use for which the subject property was best suited. Evidence offered by respondent was to the effect that as of November 8, 1965, the best use was for light industry, such as furniture manufacturing. Evidence offered by petitioner was to the effect its best use as of that date was for warehouse purposes.

Opinion evidence of five witnesses offered by respondent as to the fair market value of the subject property as of November 8, 1965, was as follows: Hylton, $282,500.00; Shavitz, $290,000.00; Conrad, $298,000.00; Samet, $321,129.00; Smith, $425,000.00.

The opinion evidence of two witnesses offered by petitioner as to the fair market value of the subject property as of November 8, 1965, was as follows: Mendenhall, $150,500.00; Robb, $135,000.00.

The issue submitted, and the jury's answer thereto, were as follows: "What is the total fair market value of the real property described in the petition? ANSWER: $240,000.00."

The court entered judgment providing that, upon payment of $240,000.00 plus interest and costs, including a fee to respondent's attorneys, the title of respondent would be divested and petitioner would be the owner in fee simple of the subject property.

Petitioner excepted and appealed.

*Haworth, Riggs, Kuhn & Haworth and Walter W. Baker, Jr., for petitioner appellant.*

*Smith, Moore, Smith, Schell & Hunter; Richmond G. Bernhardt, Jr.; and Morgan, Byerly, Post & Keziah for Denny Roll and Panel Company, respondent appellee.*

BOBBITT, J.   The issue as to the amount of damages or compensation was for determination *de novo* by jury trial in the superior court. G.S. 40-19; G.S. 40-20; *Proctor v. Highway Commission,* 230 N.C. 687, 55 S.E. 2d 479; *Gallimore v. Highway Comm.,* 241 N.C. 350, 85 S.E. 2d 392; *Redevelopment Commission v. Smith,* 272 N.C. 250, 158 S.E. 2d 65.

There was evidence that, in the appraisal of property, there are three standard approaches, namely, (1) the cost approach, (2) the income approach, and (3) the market comparison approach; that the cost approach involves a determination of the fair market value of the (vacant) land, the cost of reproduction of the buildings or replacement thereof by new buildings of modern design and materials

less depreciation; and that the income and market approaches include a consideration of the rentals and prices obtained from the lease or sale of comparable properties reasonably related in respect of location and time. Expert witnesses for respondent and for petitioner were in substantial accord that all of these approaches should be considered in forming an opinion as to the fair market value of the subject property as of November 8, 1965.

There was conflicting evidence as to each of the elements involved in the cost approach. The income approach was stressed by petitioner's evidence. It was minimized by respondent's evidence on the ground the buildings on the subject property were for a special purpose and therefore not readily rentable. Expert witnesses for respondent and for petitioner testified that, with reference to the market approach, they had taken into consideration the sale prices of comparable properties.

The legal principles governing the admissibility of evidence as to sales of comparable properties are set forth fully in prior decisions. *Barnes v. Highway Commission,* 250 N.C. 378, 109 S.E. 2d 219; *Highway Commission v. Pearce,* 261 N.C. 760, 136 S.E. 2d 71; *Highway Commission v. Coggins,* 262 N.C. 25, 136 S.E. 2d 265; *Highway Commission v. Conrad,* 263 N.C. 394, 139 S.E. 2d 553.

"Actually no two parcels of land are exactly alike. Only such parcels may be compared where the dissimilarities are reduced to a minimum and allowance is made for such dissimilarities." *Barnes v. Highway Commission, supra.* Ordinarily, the dissimilarities are greater between two sites on each of which is located a complex of buildings in use for manufacturing purposes. In *Highway Commission v. Coggins, supra,* Moore, J., for the Court, stated the basic general principle as follows: "Whether property involved in a voluntary sale is sufficiently similar in nature, location and condition to the property appropriated by condemnation to admit evidence of its sale and the price paid therefor as a guide to the value of the condemned property is a question to be determined by the trial judge in the exercise of his sound discretion."

Petitioner assigns as error rulings of the court sustaining objections to questions asked Mr. Mendenhall, petitioner's witness, on direct examination. These questions, set forth below, do not relate *directly* to the subject property. They relate to specific transactions involving the Thomas Mills property and the Continental Furniture Company property.

Witnesses for respondent had testified that, in forming an opinion as to the fair market value of the subject property on November 8, 1965, they had considered, *inter alia,* the prices at which *compar-*

*able* properties had been sold. For example, Mr. Hylton had testified that, in the market comparison approach, he had considered the prices at which eighteen different pieces of property had been sold, sixteen being vacant lots and two with buildings thereon. The proximity of each of these eighteen properties to the subject property is shown on a map offered in evidence and identified as respondent's Exhibit No. 6. Respondent's witnesses were not asked the sale price of any of these properties.

Mr. Mendenhall testified that, in the market comparison approach, he had considered sales of "fifteen, twenty, twenty-five properties," but "specifically" had "considered perhaps four." Only five properties, inclusive of the Thomas Mills property and the Continental Furniture Company property, were identified in Mr. Mendenhall's testimony.

The Thomas Mills property, to which petitioner's Exception No. 1 refers, is located some three and one-half blocks from the subject property. Mr. Mendenhall was permitted to testify the Thomas Mills property was rented on November 8, 1965, and as to the amount of rental paid therefor; and that this was one of the factors upon which he based his opinion. He testified the Thomas Mills property had been sold in January of 1960, and again in July of 1963, and that he had considered the sale prices on these occasions as one of the factors on which he based his opinion. He was asked, "What was the sale price in January, 1960, Mr. Mendenhall?" The court sustained respondent's objection to this question. If permitted to do so, Mr. Mendenhall would have answered: "Eighty-Five Thousand Dollars." Petitioner's Exception No. 1 is directed to this ruling. Thereafter, Mr. Mendenhall was permitted to testify, over objection by respondent, that the Thomas Mills property had sold in July of 1963 for $65,000.00.

It would seem that, on account of differences in location and otherwise, the trial judge, in his discretion, would have been justified in finding that the Thomas Mills property was not sufficiently comparable to permit evidence as to the rental or sale prices therefor. Certainly, the exclusion of evidence with reference thereto could not be considered an arbitrary exercise of discretionary power.

Petitioner contends the proffered testimony of Mr. Mendenhall as to the sale price in January, 1960, should have been admitted as tending to show a downward trend in the market value for property in this section of High Point. Petitioner calls attention to the fact that Mr. Hylton had testified (on cross-examination by petitioner's counsel) that "the market for old industrial plants here in High Point" was good as of November, 1965. Mr. Mendenhall expressed

the opinion "there was as of November 8, 1965, a limited market for older industrial properties comparable to" the subject property, and that he believed "the market was less strong than it might have been two years before that."

In our view, petitioner's said contention lacks substantial merit. In the first place, all relevant factors involved in and explanatory of the two sales are not disclosed. Be that as it may, the evidence, if admitted, would tend to show at most a downward trend in the market value of the Thomas Mills property. A downward trend in the market value of one piece of property some three and one-half blocks from the subject property is insufficient to show a general downward trend in property values in this section of High Point. As stated in our prior decisions, the admissibility of evidence in relation to specific facts concerning so-called comparable properties must be left in large measure to the discretion of the trial judge. Manifestly, to explore the status of each such comparable property in depth would be diversionary rather than helpful in evaluating the subject property.

The Continental Furniture Company property, to which petitioner's Exception No. 2 relates, was "within sight of," and "right across Green Street from," the subject property. Mr. Mendenhall was asked: "Do you know of your own knowledge as to the actual sale price for the land and buildings of Continental Furniture Company?" Mr. Mendenhall answered: "I know of my own knowledge that they put a price of two hundred thousand —" At this point respondent's counsel objected. The court sustained the objection and instructed the jury not to consider said partial answer of the witness. Thereafter, for the record, petitioner's counsel was permitted to ask the following question: "I asked you if you knew of your own knowledge that a price was placed on the land and buildings only by the parties and I want you to give your answer to the reporter, please." The record shows the witness whispered the following answer to the reporter: "The purchasers placed a value of two hundred thousand dollars on the land and buildings."

The transaction to which Mr. Mendenhall was referring involved the conveyance of the subject property by Continental Furniture Company to Globe Furniture Corporation, a subsidiary of Burlington Industries, in January, 1967. The exact nature of the Continental-Globe transaction is unclear. The whispered answer relates to the value placed on the land and buildings by the purchasers. Mr. Hylton, respondent's witness, testified that he did not consider said 1967 transaction in forming his opinion "due to the fact that this sale was made because of the corporate sale of stock and the value

that was placed on the land and buildings was a mutually agreed figure, and not from an actual sales figure, for the benefit of each one from the standpoint of income tax and what-have-you." He testified the Continental property "was not sold as a piece of land," but that it was a sale consisting "of buying and selling of assets, liabilities, business, good will, the whole works." Mr. Hylton's testimony seems to explain Mr. Mendenhall's testimony to the effect that two hundred thousand dollars was a valuation *the purchasers had placed* on the land and buildings in the Continental-Globe transaction.

Mr. Mendenhall testified he had taken into consideration the Continental-Globe transaction in forming his opinion as to the fair market value of the subject property on November 8, 1965. Although the jury was instructed to disregard it, the incomplete answer of Mr. Mendenhall in the hearing of the jury was to the effect that, in the Continental-Globe transaction of 1967, "a price of two hundred thousand" had been placed on the land and buildings. Error, if any, with reference to the exclusion of this evidence relating to the Continental property is not considered of such prejudicial nature as to justify the award of a new trial.

The court sustained respondent's objections to certain questions asked John Adams, petitioner's witness, on direct examination. Petitioner's Exceptions Nos. 3, 4, 5, 6 and 7 relate to these rulings.

Petitioner's Exception No. 3 is not brought forward in petitioner's assignments of error. Moreover, consideration thereof discloses it is without merit.

Mr. Adams was offered as an expert in "industrial plant layouts" and was permitted to give opinion evidence as such expert. He was permitted to testify, over respondent's objection, that, in his opinion, as of November 8, 1965, the subject property was best suited for "warehousing." Thereupon, he was asked to explain his reasons for that opinion. Respondent's objection was overruled and Mr. Adams testified: "The physical layout is too cut up and too varied. The buildings — the physical layout of the buildings makes it virtually impossible to efficiently manufacture a product such as furniture or plywood at a profit. You have many levels." When asked the further question by petitioner's counsel — "Do you mean many different floor levels?" — counsel for respondent again objected. This objection was sustained, the court stating to counsel for petitioner that he would "have to pursue his reasons for concluding that the highest and best use is for warehousing." Thereupon the court instructed the jury as follows: "(Y)ou will not consider this testimony as to the

inefficiency as to the manufacturing that he has just related." Petitioner's Exceptions Nos. 4 and 5 are directed to this ruling.

Thereafter, Mr. Adams was asked: "Mr. Adams, did you form an opinion satisfactory to yourself as to the suitability or desirability of the Denny Roll and Panel Company property, that is as to the layout of the land, the buildings, the design of the buildings, in relation to its suitability for industrial manufacturing purposes?" Respondent's objection was overruled and Mr. Adams testified: "The layout is not a satisfactory layout to efficiently run a manufacturing plant for the purpose of making a profit." Mr. Adams was also permitted to testify over respondent's objection that "the physical layout of the plant and the buildings makes it virtually impossible to efficiently process raw materials, manufacturing a finished product of the nature and make a profit."

Mr. Adams was asked: "Mr. Adams, my question is are there any particular things about this property as of November 8, 1965, that you point out as helping you arrive at your opinion?" No objection was interposed to this question. Mr. Adams answered: "Well, I said the different levels, the cut up nature of the main plant, and there are posts everywhere. I can't conceive of how a supervisor can supervise." Upon motion of respondent's counsel, the court instructed the jury: "(Y)ou will not consider what he conceives of as to a supervisor." Petitioner's Exception No. 6 is directed to this ruling.

Mr. Adams was asked: "Now Mr. Adams, can you explain how the cut up nature of the buildings which you have referred interferes with the efficiency in operation in this layout?" Respondent's objection was sustained. Petitioner's Exception No. 7 is directed to this ruling. Thereafter, whispering his answer to the reporter, Mr. Adams said: "Excessive handling."

The impression prevails that Mr. Adams' admitted testimony was sufficient to convey to the jury his opinion that the subject property was not adapted to efficient use as a manufacturing plant and the reasons for his opinion. The upshot of the matter seems to be that petitioner elicited from Mr. Adams virtually everything it sought to elicit from him. Moreover, "the cut up nature of the buildings," if such be the case, was plainly observable by the jurors when they viewed the subject property.

The court sustained respondent's objection to a question asked Joe Robb, petitioner's witness, on direct examination. Petitioner's Exception No. 9 is directed to this ruling.

Mr. Robb was offered and testified as an expert in the field of real estate appraisals. He testified, *inter alia,* that in his opinion "the highest and best use to which (the subject property) could be

put was for warehousing purposes"; that in his opinion the fair market value of the subject property as of November 8, 1965, was $135,000.00, $84,000.00 representing the value of the land and $51,-000.00 representing the value of the buildings; and that, when considering the cost approach of appraisal, he used "a replacement cost approach as opposed to a reproduction cost approach."

With further reference to the replacement cost approach, Mr. Robb referred to "functional obsolescence" and "superfluous or superadequate construction." The record shows the following occurred:

"Q. Can you tell us what some of those superfluous items are? A. One of those that come to mind immediately is the type of wall construction in the brick portion of the building. Today they build with eight-inch block and one four-inch course of brick on the veneer. This is primarily on the front. Most manufacturers on the side and rear just put the block. They don't veneer it. The floor structure is— MR. BERNHARDT: I believe I will object. I don't think he is qualified in this area. I object and move to strike. MR. POST: On his own testimony, he said he was not qualified. COURT: Well, I have forgotten what the question was now. Read the question. (The question was read by the Reporter as follows: 'Can you tell us what some of those superfluous items are?' COURT: The objection is sustained. PETITIONER'S EXCEPTION No. 9. MR. HAWORTH: We would like to get his answer into the record. COURT: Let him whisper his answer to the Reporter so that the jury can't hear it. (The witness whispered his answer to the Reporter as follows: 'I mentioned the brick walls and floor system, the roof structure, that will be enough.')"

Petitioner had not offered Mr. Robb as an expert construction engineer or an expert in respect of construction costs. It is noted that when the question, "Can you tell us what some of those superfluous items are," was first asked, respondent did not object; and a rather extensive answer was given by Mr. Robb before any objection was interposed. The court did not at any time instruct the jury not to consider the testimony Mr. Robb had given. This testimony was far more extensive than the answer Mr. Robb later whispered to the reporter. Each of the buildings had been described in considerable detail and the jurors had observed them. Mr. Robb testified he "took the approach of replacement rather than reproduction," and "estimated the depreciation or the loss of value that had occurred in this property due to age, due to functional deficiencies, not being of modern construction."

Much testimony was offered during the course of a long trial. Conceding there may have been technical errors in rulings on evi-

dence, some adverse to petitioner and others adverse to respondent, petitioner's assignments of error based on the exceptions discussed above do not disclose any error of such prejudicial nature (to petitioner) as to justify the award of a new trial.

Plaintiff's remaining assignments of error, other than formal assignments, involve (1) two instances where plaintiff asserts the presiding judge made prejudicial comments, and (2) an excerpt from the court's charge. After careful consideration of each, the conclusion reached is that these assignments do not disclose prejudicial error or present questions of sufficient substance to merit discussion thereof in detail.

Petitioner having failed to show prejudicial error, the verdict and judgment will not be disturbed.

No error.

Huskins, J., took no part in the consideration or decision of this case.